FILED

2005 Aug-15  PM 02:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ESTHER LARGE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-03–S-1276-S |
| | ) | |
| STATE OF ALABAMA | ) | |
| DEPARTMENT OF HUMAN | ) | |
| RESOURCES, *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Esther Large, sued five defendants: the State of Alabama Department of Human Resources ("Alabama DHR"); the Blount County Department of Human Resources ("Blount DHR"); John James, the Director of Blount DHR; Henrietta Ellis, a supervisory employee of Blount DHR; and, Rex Murphree, another employee of Blount DHR.[1]  She claimed defendants failed to promote her to three management positions because of her race (African American), color, and sex (female), subjected her to a hostile work environment based on the same characteristics, and in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff's failure to promote and hostile work environment claims are based upon the Equal Protection Clause of the Fourteenth Amendment to

---

[1] *See* doc. nos. 1 (original complaint) and 19 (amended complaint).

the United States Constitution,[2] and asserted under 42 U.S.C. § 1983.  Her retaliation

claim is based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e *et seq*.[3]  Alabama DHR and Blount DHR are the only defendants to the Title

VII claim.

## I. PROCEDURAL HISTORY

Plaintiff filed an EEOC charge against Alabama DHR and Blount DHR on

October 23, 2001, asserting that she had been denied promotions to "two positions as

Service Supervisor . . . in July 2001," because of her race and sex "in violation of Title

VII of the Civil Rights Act of 1964, as amended."[4]  The EEOC terminated its

investigation on March 8, 2002, and mailed plaintiff a form "Dismissal and Notice of

Rights" stating that:

> the EEOC is unable to conclude that the information obtained establishes
> violations of the statutes.  This does not certify that the respondent is in
> compliance with the statutes.  No finding is made as to any other issues
> that might be construed as having been raised by this charge.
>
> . . .
>
> This will be the only notice of dismissal and of your right to sue that we
> will send you.  You may file a lawsuit against the respondent(s) under
> federal law based on this charge in federal or state court.  Your lawsuit
> **must be filed <u>WITHIN 90 DAYS</u> from your receipt of this Notice**;
> otherwise, your right to sue based on this charge will be lost.  (The time

---

[2] *See id.*, ¶¶ 16-19.

[3] *See id.*, ¶ 20-24.

[4] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 13, at 2.

limit for filing suit based on a state claim may be different.)[5]

Despite this clearly-worded notice, plaintiff did not commence an action in this court until May 29, 2003, more than fourteen months later.  As a consequence, any Title VII claims that could have been included in a judicial complaint based upon the allegations of plaintiff's EEOC charge were time-barred.  See 42 U.S.C. § 2000e-5(f)(1) ("a civil action may be brought against the respondent named in the charge" within 90 days after the EEOC issues notice of a complainant's right to sue); *see also Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 149 (1984) (*per curiam*) (affirming dismissal of Title VII claim because of the plaintiff's failure to file a complaint meeting the requirements of Fed. R. Civ. P. 8(a)(2) within 90 days of receipt of right-to-sue letter).  *Cf. Leonard v. Rumsfeld*, 146 F. Supp. 2d 1227, 1239 (M.D. Ala.) (dismissing Federal employee's Title VII claim for failure to commence suit within 90 days of receipt of notice of final agency action, as required by 42 U.S.C. § 2000e-16), *aff'd* 29 Fed. Appx. 575 (11th Cir. 2001) (Table, No. 01-13847).

For that reason, plaintiff based all of the claims in her original complaint solely upon the Equal Protection Clause of the Fourteenth Amendment, and asserted them under 42 U.S.C. § 1983.  She alleged that defendants had subjected her to a hostile work environment and failed to promote her three times, once in 1999 and twice in

---

[5] *Id.* at 3 (all emphasis in original).

2001,[6] because of her race, color, and sex, as well as in retaliation for her act of filing an EEOC charge.

Defendants moved to dismiss various aspects of plaintiff's original complaint on the basis of Eleventh Amendment immunity, qualified immunity, the statute of limitations, and failure to state a claim upon which relief may be granted.[7] The motion was granted in part and denied in part.[8]

Plaintiff's claim that she was denied the Quality Assurance Coordinator position awarded to defendant Rex Murphree in 1999 was dismissed as a time-barred, "discrete discriminatory act." *See*, *e.g.*, *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 114 (2002) (holding that "discrete discriminatory acts are not actionable if time barred," and that "termination, *failure to promote*, denial of transfer, or *refusal to hire* are easy to identify" as discrete discriminatory acts) (emphasis supplied); *Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002) (summarizing Supreme Court's holding in *Morgan*); *Owens v. Okure*, 488 U.S. 235, 249-50 (1989) (holding that the general, or residual, statute of limitations governing personal injury actions under the law of the forum state is the proper measure of the limitations period for an action founded upon 42 U.S.C. § 1983);

---

[6] *See* doc. no. 1 (original complaint), ¶¶ 10-13.

[7] *See* doc. no. 8.

[8] *See* doc. nos. 14 (memorandum opinion) and 15 (accompanying order).

*Lufkin v. McCallum*, 956 F.2d 1104, 1108 (11th Cir. 1992) (applying *Owens* rule retroactively, and holding that plaintiff's § 1983 claims were barred by Ala. Code § 6-2-38(l) (1975), Alabama's two-year "general," or "residual," statute of limitations).[9]

All of plaintiff's claims for money damages and *retrospective* declaratory and injunctive relief against Alabama DHR, Blount DHR, and the individual defendants in their "official capacities" were dismissed as barred by the Eleventh Amendment. That amendment long has been construed in a manner that bars federal courts from hearing suits commenced by private litigants against non-consenting states, state agencies, and state employees sued in an official capacity for the recovery of money damages and retrospective declaratory and injunctive relief. *See, e.g., Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States. The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court.") (citations omitted); *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States.").

---

[9] *See also* doc. no. 14 (memorandum opinion), at 20-23.

The immunity provided by the Eleventh Amendment, however, applies only "to states and state officials *but not* to municipal corporations, *counties, or other political subdivisions of the state.*" *Robinson v. Georgia Department of Transportation*, 966 F.2d 637, 638 (11th Cir. 1992) (emphasis supplied) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Consequently, the question of whether the Amendment barred the claims against Blount DHR and the employees of that entity also had to be addressed.

The courts of Alabama often have held that the Alabama Department of Human Resources, and all of the sixty-seven county Departments of Human Resources, possess absolute immunity from suit in any court pursuant to Article I, § 14 of the Alabama Constitution of 1901 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity."). *See*, *e.g.*, *Ex parte Mobile County Department of Human Resources*, 815 So. 2d 527, 530 (Ala. 2001) (holding that state *and federal* claims against the State and county departments of human resources, and "official capacity" claims against individual defendants employed by those departments, were barred).[10] Other federal courts that have considered the same issue,

---

[10] *See also*, *e.g.*, *Burgoon v. Alabama State Dep't. of Human Resources*, 835 So. 2d 131, 133 (Ala. 2002) (holding a county department of human resources and employees sued in an "official capacity" entitled to absolute immunity); *Ex parte Franklin County Dep't. of Human Resources*, 674 So. 2d 1277, 1279 (Ala. 1996) (holding that a county department of human resources is "considered to be a State agency for purposes of asserting the defense of sovereign immunity," and have "absolute immunity from suit in any court" under Ala. Const. Art. I, § 14 (1901)); *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992) (holding Alabama DHR, Barbour County DHR, and individual

but through the lens of Eleventh Amendment jurisprudence, reached the same conclusion. *See*, *e.g.*, *Mack v. State of Alabama Department of Human Resources*, 201 F. Supp. 2d 1196, 1207 (M.D. Ala.) (holding that, "insofar as the County Board is established under the umbrella of the ADHR pursuant to state statute and that its internal practices are mandated by the State Board, it is a state agency and is not subject to suit under Section 1983"), *aff'd*, 52 Fed. Appx. 492 (11th Cir. 2002) (Table, No. 02-11262); *Ross v. State of Alabama*, 893 F. Supp. 1545, 1550 (M.D. Ala. 1995) (holding a county department of human resources and employees sued in an "official capacity" entitled to Eleventh Amendment immunity from § 1983 claims for money damages). Plaintiff, nevertheless, was allowed to pursue *prospective* declaratory and injunctive relief against those defendants.[11]

---

defendants sued in their "official capacities" entitled to absolute immunity); *Ex parte State Dep't. of Human Resources*, No. 2030570, 2004 WL 2128979 (Ala. Ct. Civ. App. Sept. 24, 2004) (holding Alabama DHR, Calhoun County DHR, and State Personnel Board entitled to absolute immunity); *Ex parte Macon County Dep't. of Human Resources*, 716 So. 2d 743, 744 (Ala. Ct. Civ. App. 1998) (holding Alabama DHR and County DHR entitled to absolute, "sovereign" immunity from plaintiff's § 1983 claims).

[11] *See* doc. no. 14 (memorandum opinion) at 17. While the Eleventh Amendment generally provides immunity to the states, state instrumentalities, and state officials sued in an official capacity from liability for compensatory money damages or retrospective equitable relief, the Supreme Court's seminal decision in *Ex Parte Young,* 209 U.S. 123 (1908), is the progenitor of a well-recognized exception to Eleventh Amendment immunity:  *i.e.*, suits against state *officers* seeking *prospective* equitable relief to end *continuing* violations of federal law, or to obtain declaratory relief, are not barred. *See id*. at 159-60 (holding that a state official who has acted unconstitutionally may be sued in his official capacity for prospective injunctive relief because such a suit "does not affect the State in its sovereign or governmental capacity," and, an official who commits an unconstitutional act is deemed "stripped of his official or representative character"). *See also*, *e.g.*, *Pennhurst*, 465 U.S. at 102 (holding that prospective injunctive relief may be sought in "a suit challenging the constitutionality of a state official's action") (discussing *Ex parte Young*); *Miller v.*

7

Plaintiff's § 1983 retaliation claim — insofar as it sought retrospective money damages from the individual defendants in their personal capacities[12] — was dismissed, because there is no clearly established right under the Equal Protection Clause to be free from retaliation and, therefore, the individual defendants were entitled to qualified immunity.[13]  *See, e.g., Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim . . . simply does not implicate

---

*King*, 384 F.3d 1248, 1264 (11th Cir. 2004) ("While the Eleventh Amendment generally bars suits against non-consenting states, '[u]nder the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), there is a long and well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law."); *McClendon v. Georgia Department of Community Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) ("The *Young* doctrine permits federal courts to entertain suits against state officers seeking *prospective* equitable relief to end continuing violations of federal law.") (citations omitted) (emphasis in original); *Summit Medical Associates v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) ("The Eleventh Amendment generally does not bar the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law."); *Cross v. State of Alabama*, 49 F.3d 1490, 1502-03 (11th Cir. 1995) (holding that plaintiffs' § 1983 official capacity claims against the Commissioner and Associate Commissioner of the state Department of Mental Health and Mental Retardation, and the Director of that department's Taylor Hardin Secure Medical Facility, for prospective injunctive relief [*i.e., reinstatement*] "is not treated as an action against the state, and the 'Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief'") (quoting *Lassiter v. Alabama A&M University*, 3 F.3d 1482, 1485 (11th Cir. 1993)).

[12] When a state official is sued personally, or in an "individual capacity," the plaintiff thereby seeks money damages directly from the individual official. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165 (1985). *Cf. Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer."). Such suits are not barred by the Eleventh Amendment. Stated differently, the official is deemed to be a "person" subject to suit for money damages, because relief is sought from the individual, *not* the state entity of which the officer is the agent. *See, e.g., Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983"); *Colvin v. McDougall*, 62 F.3d 1316 (11th Cir. 1995).

[13] *See* doc. no. 14 (memorandum opinion) at 19.

the Equal Protection Clause.") (collecting authorities, and noting that § 1983 retaliation claims generally are based upon adverse employment actions that follow a state employee's exercise of First Amendment rights).

Further, plaintiff's failure-to-promote claims against defendant Rex Murphree, in both his official and individual capacities, and for all types of relief, were dismissed, because there was no evidence that Murphree had any influence upon the decisions to not promote plaintiff.[14]

In summary, after ruling upon defendants' first motion to dismiss, the following aspects of plaintiff's original complaint remained pending:  with the one exception pertaining to defendant Murphree noted below, plaintiff was allowed to proceed against Alabama DHR, Blount DHR, and all individual defendants in their official capacities for *prospective* declaratory and injunctive relief on all of her claims; she was allowed to proceed against defendants John James and Henrietta Ellis in their individual capacities for equitable relief on her retaliation claim, for both money damages and equitable relief on her hostile work environment claim, and for both money damages and equitable relief on all failure-to-promote claims *other than* the claim relating to the Quality Assurance Coordinator position awarded to defendant Murphree in 1999.  She was allowed to proceed against defendant Murphree in his

---

[14] *See id.* at 25-26.

individual capacity for equitable relief on her retaliation claim, and for both money damages and equitable relief on her hostile work environment claim.

Plaintiff later was granted leave to amend her complaint,[15] but the amended pleading reiterated the same § 1983 claims in their entirety, and added a retaliation claim against Alabama DHR and Blount DHR under Title VII.[16] Defendants moved to dismiss plaintiff's amended complaint.[17] One aspect of the motion stated the obvious: plaintiff's amended complaint reasserted claims that the court previously dismissed. That part of the motion was granted.[18] Defendants also argued that the Title VII retaliation claim should be dismissed for failure to exhaust administrative remedies.[19] That aspect of the motion was denied;[20] however, as will be discussed below, this court erred in denying defendants' motion to dismiss plaintiff's Title VII retaliation claim.[21]

The action now is before the court on defendants' motion for summary

---

[15] *See* doc. nos. 17 and 18.

[16] Doc. no. 19.

[17] Doc. no. 21.

[18] Doc. nos. 24-25.

[19] Doc. no. 21.

[20] Doc. nos. 24-25.

[21] *Cf.* Robert Fulghum, ALL I REALLY NEED TO KNOW I LEARNED IN KINDERGARTEN (*e.g.*, "Clean up your own mess.").

judgment.[22] Upon consideration of the motion, briefs,[23] and evidentiary submissions,[24]

the court finds that summary judgment is due to be entered on all remaining claims.[25]

## II. FACTS

The Alabama Department of Human Resources directs the sixty-seven county

---

[22] Doc. no. 40.

[23] Doc. no. 40 (Defendants' Memorandum Brief); doc. no. 55 (Plaintiff's Opposition); doc. no. 57 (Defendants' Reply).

[24] Doc. no. 41 (Evidentiary Materials for Defendants); doc. no. 42 (Esther Large deposition); doc. no. 43 (John James deposition); doc. no. 44 (Henrietta Ellis deposition); doc. no. 45 (Rex Murphree deposition); doc. no. 46 (Cheryl Helton deposition); doc. no. 47 (Thomas King deposition); doc. no. 56 (Evidentiary Materials in Support of Plaintiff's Opposition).

[25] Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

departments of human resources that provide welfare services to Alabama residents:[26] *e.g.*, "relief to persons in need of assistance; the performance of family welfare services; the care of children who are dependent, neglected, under insufficient guardianship, or otherwise handicapped, and such other child-care activities as shall be directed to [the county department] by the State Department of Human Resources." Ala. Code § 38-2-8(b) (1975). Blount DHR is one such agency, and it is divided into four operating units:  financial assistance; adult services; child support; and child welfare.[27]

John James was Director of Blount DHR during the period relevant to this lawsuit,[28] and Henrietta Ellis was "Program Supervisor."[29] Ellis directly supervised the employees in the child welfare unit; and, when the Director was absent, she "indirectly supervise[d] the entire office."[30] The child welfare unit included nine or ten employees, one of whom is plaintiff, Esther Large.[31] Plaintiff was hired as an "Associate Worker I" in the child welfare unit during January of 1982.[32] Her duties "involved going to the home, working with families, . . . [and] making sure that the

---

[26] *See* doc. no. 47, King deposition, at 22-27.

[27] *See* doc. no. 43, James Deposition, at 36.

[28] *See id.*

[29] *See* doc. no. 44, Ellis Deposition, at 35-38.

[30] *Id.* at 35, 38-39.

[31] Doc. no. 43, James Deposition, at 41-42.

[32] Doc. no. 42, Large Deposition, at 10-11, 13.

children were safe while they were in the home."[33]  Plaintiff has remained in the child welfare unit throughout her career;[34] and, as of April 29, 2002, she held the position of "Social Service Caseworker."[35]  In 2002, James remarked that plaintiff was "a good worker and has done a good job in her position for Blount County DHR for many years."[36]

While plaintiff's claims focus on events that occurred between 2001 and 2003, she alleges that two events outside that timeframe are relevant to her assertion that defendant Henrietta Ellis harbors a racist animus against persons with African ancestors.  For example, Marva Reed — who, like plaintiff, is African American, but not a party to this suit — worked at Blount DHR from 1995 to 1996.  She was directly supervised by Ellis.[37]  On one occasion, she reported to Ellis that a white client had come on the premises of Blount DHR, confronted her in the lobby, and referred to her as a "nigger" and a "Nubian bitch."[38]  Reed became upset when Ellis failed to take "any steps to address this client's behavior," and "reacted to [her] concerns with neglect and nonchalance."[39]

---

[33] *Id.*, at 13.

[34] *See id.*

[35] *See* doc. no. 41, Ex. 4 ("Classification" as "Social Service Caseworker").

[36] *Id.*, Ex. 6.

[37] *See* doc. no. 56 (Plaintiff's evidentiary submission), Ex. 3, Reed Declaration, ¶ 2.

[38] *Id.*, ¶ 4.

[39] *Id.*

The next event occurred in 1999, when plaintiff applied for a "Quality Assurance Coordinator/Resource Development" position that ultimately was awarded to defendant Rex Murphree.[40]  While there is no evidence that Ellis made the decision to deny plaintiff's application,[41] Meg Wood, one of plaintiff's white co-workers,[42] asked Ellis about the decision.  Ellis stated that "[t]he community is just not ready for Esther."[43]  Wood concluded that, "[b]ased on my personal experience working for Henrietta Ellis and from knowing her and observing Henrietta Ellis over the years, I believe that this statement meant that Henrietta Ellis did not want a black person . . . [for] that position."[44]  The population of Blount County was then (and still is) predominately white.[45]

## A.    The First Contested Promotional Opportunity

Blount DHR created a new management position called "Service Supervisor" during the Spring of 2001.[46]  There were two minimum qualifications for the position: an applicant was required to "have at least two years' experience as a social worker";[47]

---

[40] *See* doc. no. 42, Large Deposition, at 22-32.

[41] *See id.* (plaintiff asked Reba Cantrell, the Director of Blount DHR at this time, to explain why she was denied the position).

[42] *See* doc. no. 43, James deposition, at 136.

[43] *See* doc. no. 56 (Plaintiff's evidentiary submission), Ex. 2, Meg Wood declaration, ¶ 5; *see also* doc. no. 42, Large deposition, at 22-32, but especially pages 29-32.

[44] Doc. no. 56 (Plaintiff's evidentiary submission), Ex. 2, Meg Wood declaration, ¶ 5.

[45] *See* doc. no. 42, Large deposition, at 181-82.

[46] Doc. no. 41 (Defendants' Evidentiary Materials), Ex. 1, James affidavit, at 2.

[47] Doc. no. 43, James deposition, at 81.

and, the applicant was required to take a written test developed and administered by the State of Alabama Personnel Department ("State Personnel Department"), which is not a party to this suit.[48]   The test was designed to assess "the skills that would be needed by someone in a supervisory position."[49]   The State Personnel Department graded the examinations and grouped applicants in "bands" corresponding to how well each applicant performed relative to all other persons who sat for the same test.[50] Like golf, a low band number indicated superior performance.

Plaintiff sat for the examination on March 2, 2001.[51]   The State Personnel Department issued a register of persons eligible to be considered for the Blount DHR position on May 18, 2001, and James received the register three days later.[52]   The register included the names of four persons:  Rex Murphree, a white male, and Cheryl Helton, a white female, whose test scores placed each in "Band 3"; Helen Willis, a white female grouped in "Band 4"; and plaintiff, listed in "Band 5," indicating that she attained the lowest score of the four persons on the register of eligibles.

Plaintiff was interviewed by John James.[53]   She does not recall much of the

[48] *See id*; *see also* doc. no. 47, King deposition, at 44.

[49] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 2.

[50] Doc. no. 47, King deposition, at 44-45.

[51] Doc. no. 42, Large deposition, at 184-85.

[52] Doc. no. 41 (Defendant's Evidentiary Submission), Ex. 1, James affidavit, at 2; *id.*, Ex. 2. The Register of eligible candidates was certified on May 18, 2001, and received by Blount DHR on May 21, 2001.

[53] *See* doc. no. 42, Large deposition, at 73.

conversation, except that James reviewed the basic requirements of the job, and she

expressed her belief that she "would be a great asset to the department" in the new

position.[54] James also conducted an interview with Murphree,[55] who had been hired

by Blount DHR as a "Social Worker I" in August of 1983.[56]  He transferred to the

adult services unit in 1994, but returned to the child welfare unit in 1999, when he

became "Quality Assurance Coordinator."[57]   In that position, Murphree reviewed

agency records to ensure that Blount DHR was complying with the requirements of

a consent decree entered by the U.S. District Court for the Middle District of Alabama

in December of 1991, generally referred to as the "R.C. consent decree."[58]

Murphree, not plaintiff, was promoted to Service Supervisor in May or June of

2001.[59] James exercised "sole hiring authority for the county" DHR and, therefore,

he "alone made the decision to hire Mr. Murphree for the service supervisor

position."[60]  James explained that:

I selected Mr. Murphree for the supervisory position instead of [plaintiff]

---

[54] *Id.* at 73-74.

[55] *See* doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 3.

[56] Doc. no. 45, Murphree deposition, at 21-22.

[57] *See id.* at 29-31; *see also* doc. no. 41 (Defendant's Evidentiary Submission), Ex. 1 at 3-4.

[58] *See* doc. no. 46, Helton deposition, at 70 (describing duties of Quality Assurance worker); doc. no. 41 (Defendant's Evidentiary Submission), Ex. 1, James affidavit, at 2.  *See also R.C. v. Walley*, No. 288CV1170DWO, 2005 WL 1138739 (M.D. Ala. May 13, 2005) (summarizing facts and consent decree requirements).

[59] *See* doc. no. 41 (Defendant's Evidentiary Submission), Ex. 1, James affidavit, at 3-4.

[60] *Id.* at 5; *see also* doc. no. 43, James deposition, at 36.

as Mr. Murphree was the best qualified person for the job.  At that time, Mr. Murphree had worked for DHR for 18 years (started in August 1983).  He had a good work record and had knowledge of the requirements of the *R.C.* consent decree.  Most importantly, he was in band 3 on the register. [Plaintiff] had worked for DHR for 19 years (started in January 1982) and also had a good work record.  However, she was in band 5 of the register, the lowest of any of the candidates.  A placement in band 5 indicates a low score on the supervisory test.[61]

Ellis (the Program Supervisor) was "completely out of the loop" with regard to this decision.[62]  James was "heavily, heavily involved in [the] child welfare" unit during this period, and he "didn't feel that [he] needed Ms. Ellis' input."[63]  After his promotion, Murphree was assigned to directly supervise plaintiff, which relieved Ellis of that duty.[64]

## B.   The Second Contested Promotional Opportunity

Murphree's promotion to Service Supervisor created a vacancy in his former position of Quality Assurance Coordinator ("QA position").  Initially, there was some uncertainty as to whether the QA position would retain a "non-management" designation, or be reclassified as a supervisory position.  James had submitted a request to Alabama DHR to upgrade the position to management status, but the request was still pending on the date Murphree was promoted.[65]  *James asked plaintiff*

---

[61] Doc. no. 41 (Defendant's Evidentiary Submission), Ex. 1, James affidavit, at 3.

[62] Doc. no. 43, James deposition, at 48.

[63] *Id.* at 50-51.

[64] *See* doc. no. 41 (Defendants' Evidentiary Submission), Ex. 5.

[65] *Id.*, Ex. 1, James affidavit at 4.

*if she desired to apply for the position, but she declined.*

James filled the position with Cheryl Helton, who is white, in June of 2001.[66] According to James, "[i]t was around this same time that I received *informal word* from the State DHR office that the QA position *would likely be* upgraded to a supervisory position"; even so, he only "*officially* received word that the QA position had been upgraded to a supervisory position . . . in mid-July 2001," a month after Helton had been selected to fill the vacancy.[67]

James explained that, "[w]hen a social worker position is upgraded to a supervisor position, everyone who is on the supervisor register is eligible to apply for that upgraded position." Therefore, "[e]ven though Ms. Helton had been working in the QA position as a social worker, she did not automatically move into the QA supervisor position."[68]

The State Personnel Department issued a register of candidates eligible to apply for the upgraded QA position on July 12, 2001, and James received the list sometime thereafter. The register named three candidates: plaintiff, Helton, and Helen Willis (who did not pursue the promotional opportunity).[69] The register specified that

---

[66] *Id.*

[67] *Id* (emphasis supplied).

[68] *Id.*

[69] *See* doc. no. 41 (Defendants' Evidentiary Materials), Ex. 1, James affidavit, at 5; *see id.* Ex. 3.

plaintiff's score on her supervisory test placed her in "Band 5," while Helton's score placed her in "Band 3," a superior mark.  Plaintiff interviewed for the position, even though she believed it was a mere formality:

> Q.     QA Service Supervisor . . . . You interviewed for that with who?
>
> A.     With John James.
>
>        . . . .
>
> Q.     Anyone else in the room?
>
> A.     No.
>
> Q.     And what did he tell you about the position?
>
> A.     He told me that the position had already been taken by Cheryl Helton, but he was interviewing me for the position.
>
> Q.     Did you understand what that meant?
>
> A.     No.  That's why I wanted a clearance.  I even asked him before I interviewed.  I asked him what would be the reason for me to interview for the position if he was saying it was already taken. And that's when he said, "You have a right to be interviewed."[70]

James also interviewed Helton for the promotion.[71]  She had been hired by the Lowndes County Department of Human Resources as a "Financial Support Social Worker" in January of 1989.  In that position, Helton determined a resident's

---

[70] Doc. no. 42, Large deposition, at 87-88.

[71] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 4.

eligibility for food stamps, Medicaid, and other public assistance.[72] She was promoted to "Financial Support Supervisor" sometime before 1997. In that position she distributed cases to employees under her supervision and reviewed their work.[73] Helton transferred to Blount DHR in 1997, where she took a "voluntary demotion" to the position of "Service Social Worker" in the child welfare unit.[74] She then assumed the duties of QA coordinator in June of 2001, filling the vacancy created by Murphree's promotion, but only after James had offered the position to plaintiff and she declined.

Helton, not plaintiff, was promoted to the upgraded, QA supervisory position sometime in July of 2001. James explained the decision as follows:

> I selected Ms. Helton for the QA supervisor position as she was the best qualified person for the position. She had worked for DHR, both in Blount County and in Lowndes County, for 12 years (starting in January 1989). She had also held a financial support supervisory position in Lowndes County. I took into consideration the fact that she performed well in the QA position for the past month while it was still a worker position. However, one of the most significant factors was that she was listed in band 3 on the register while [plaintiff] was in band 5 on the register . . . . This indicated that Ms. Helton performed significantly better on the supervisory test than did [plaintiff]. Even if Ms. Helton had not been serving in the QA position at the time it was elevated to a supervisor position, her higher score on the supervisory test would have made her better qualified than [plaintiff] for the QA supervisor

---

[72] Doc. no. 46, Helton deposition, at 41-42.

[73] *Id.* at 43-44.

[74] *Id.* at 46-47.

position.[75]

In this instance, however, James *did confer* with defendant Henrietta Ellis about the

promotional decision:

> Q.    Did you get any input at this time at all from Ms. — Ms. Ellis in
> any way about this position? . . . .
>
> A.    The only thing I remember [Ellis] and I discuss[ed], [she]
> mentioned to me that she thought [Helton] had been doing a very
> good job as the QA worker.
>
>       . . . .
>
> Q.    What did Ms. Ellis say, if anything, about Ms. Large when you
> were making — trying to make the decision about whom to
> appoint?
>
> A.    I don't remember her saying anything about Ms. Large.  All I
> remember just in discussions was that [Helton] was doing a good
> job as the QA worker.
>
> Q.    So Ms. Ellis recommended Ms. Helton.  Did she recommend Ms.
> Large at all for the QA?
>
> A.    She didn't actually give me a recommendation.  She just told me
> that she thought [Helton] was doing a good job.
>
> Q.    And that figured into your decision?
>
> A.    But, yes.  Sure, sure, yes, sir.
>
> Q.    And so you ultimately made the decision, then, to hire Ms. Helton
> for the position?

---

[75] Doc. no. 41 (Defendants' Evidentiary Materials), Ex. 1, James affidavit, at 4-5.

A.    Right.[76]

C.    **Plaintiff's EEOC Complaint and Ensuing Events**

As noted in Part I of this opinion, plaintiff filed an EEOC charge on October 23, 2001.[77]  She claimed that Alabama DHR and Blount DHR had denied her two promotions earlier that year because of her race and sex, in violation of Title VII.[78] Plaintiff stated: "I am the only Black employee working in children's services.  There has never been a Black employee hired in the position of supervisor during my nineteen years of employment."[79]  James was made aware of this complaint, but the record does not reflect the date on which he learned of it.[80]  James informed Ellis and Helton of plaintiff's charge, although, again, the record does not specify when.[81]

Murphree (the new Service Supervisor) conducted plaintiff's annual "Performance Appraisal" the year following her EEOC charge, on April 23, 2002. The evaluation reflected plaintiff's work performance for the period May 1, 2001 to May 1, 2002.[82]  The appraisal process required Murphree to calculate a

---

[76] Doc. no. 43, James deposition, at 98-99.  Cheryl Helton opined that, if Henrietta Ellis recommended an employee for promotion, her input would be "very, very important" to John James's decision-making process.  Doc. no. 46, Helton deposition, at 82.

[77] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 13 (EEOC Charge of Discrimination).

[78] *See id.*

[79] *Id.*

[80] *See* doc. no. 43, James deposition, at 151.

[81] *See* doc. no. 44, Ellis deposition, at 79; doc. no. 46, Helton deposition, at 32.

[82] *See* doc. no. 41 (Defendants' Evidentiary Materials), Ex. 4.

"Responsibility Score," and to deduct points from that score if the employee had been reprimanded or suspended.   The resulting number constitutes an employee's "Performance Appraisal Score," which then is placed in one of five categories: "Does Not Meet Standards"; "Partially Meets Standards"; "Meets Standards"; "Exceeds Standards"; or "Consistently Exceeds Standards."[83]

Murphree awarded plaintiff a "Responsibility Score" of 31.4 and, because he did not deduct any points for discipline, her net "Performance Appraisal Score" was the same number, 31.4.  This placed her in the next-to-highest, "Exceeds Standards" category.   Plaintiff, nevertheless, disagreed with this rating.   When she asked Murphree to explain her score, Murphree merely replied, "There's room for improvement."[84]  She then submitted a written complaint to James, stating that "[m]y evaluation dropped from consistently exceeds standards . . . to exceed standards.  My evaluations for the last ten years or more have been consistently exceed standards."[85]

James reassigned plaintiff to work under the supervision of Henrietta Ellis on April 29, 2002, a week after plaintiff received her Performance Appraisal.[86]  The relevant hierarchy, therefore, reverted to what it had been previously:  James was

---

[83] *See id.* (instructions given under each heading); *see also id.*, Ex. 21 (Performance Appraisal manual).

[84] Doc. no. 42, Large deposition, at 127.

[85] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 5.

[86] *See id.*

Director of Blount DHR; and Ellis, the Program Supervisor, resumed direct supervision over plaintiff.  Murphree remained Service Supervisor, but he no longer exercised supervision of plaintiff.  No reason is given for this change.[87]

Ellis issued a "written warning" to plaintiff a month later, on June 5, 2002.[88] The missive alleged that James had given certain instructions to plaintiff, but she had refused to follow them.  The warning advised that "[f]ailure to follow written and oral directives from the Director and/or supervisors can be considered insubordination . . . and can result in progressive discipline and a lowering of your evaluation . . . . Consider this a written warning regarding failure to follow instructions from the Director."[89]

A "written warning" was the lowest level of discipline in Blount DHR's four-step procedure, progressively followed by a "written reprimand," then "suspension," and, finally, "dismissal."[90]  Following the issuance of a written warning to an employee, the supervisor placed a copy of the warning in the employee's personnel file,[91] and documented the fact that a warning had been issued in the next Performance

---

[87] James merely stated that "I made some changes in the office responsibilities and moved Ms. Large under the supervision of Ms. Ellis rather than M[r.] Murphree." Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 7.

[88] *Id.*, Ex. 8; *see also id.*, Ex. 1, James affidavit, at 7-8 (characterizing the corrective measure as a "written warning" or "letter of warning").

[89] Doc. no. 41 (Defendants' Evidentiary Materials), Ex. 8.

[90] *Id.*, Ex. 21, Performance Appraisal manual, at 51 ("Disciplinary Actions" section).

[91] *See id.*, Ex. 4 (stating, in "Disciplinary Action" section, that "[c]opies of disciplinary

Appraisal.[92]  Even so, a written *warning*, standing alone, had no tangible impact upon

an employee's work record or compensation.  Discipline had to proceed to the second

step of a written *reprimand* to trigger more severe consequences.  An employee who

received a written *reprimand* would have seven points deducted from his or her

Responsibility Score during the next Performance Appraisal cycle.[93]  A *suspension*

resulted in a seventeen point deduction.[94]

    Ellis conducted plaintiff's next Performance Appraisal on April 21, 2003.[95]  She

gave plaintiff a Responsibility Score of 35.6 and, because she did not deduct any

points for discipline, plaintiff's Performance Appraisal Score also was 35.6.[96]  Again,

this placed plaintiff's performance in the "Exceeds Standards" category.  Ellis also

noted in the evaluation that plaintiff "received a written warning for insubordination

and failure to perform her job properly on 6/5/02.  Future violations of these work

rules may result in more serious personnel action."[97]

    The Performance Appraisal also included a section on "Work Habits," which

required a supervisor to mark a box for "Noncompliance" if an employee was given

---

documentation are to be maintained in the agency's personnel files").

    [92] *See id.* at "Work Habits" and "Disciplinary Actions" sections.

    [93] *See id.* at "Disciplinary Score" section.

    [94] *See id.*

    [95] Doc. no. 41 (Defendants' Evidentiary Materials), Ex. 9.

    [96] *See id.*

    [97] *Id.* at "Disciplinary Actions" section.

a written warning, written reprimand, or suspension during the review period.[98]  Ellis

neglected to make this notation — even though, as discussed in the text accompanying

note 92, *supra*, plaintiff had received a written warning.

James reviewed plaintiff's Performance Appraisal on April 25, 2003,[99] and

amended it by marking the box for "Noncompliance" (placing his initials in the

margin beside the change).[100]  Plaintiff transmitted an e-mail to Kelly Lever, a

Supervisor at Alabama DHR, asking whether that revision was permissible.[101]  Ms.

Lever replied that it was, saying:

> The policies governing the performance appraisal process require that
> "Non-compliance" be marked on the performance appraisal form when
> an employee is given a written warning, written reprimand, or
> suspension.  When a written warning is administered, such as in your
> situation, no points are deducted from the evaluation score.  However,
> the "Non-compliance" must indicate that the warning occurred.
>
> Mr. James states that he was not aware that this measure had to be taken.
> Due to the review of all performance appraisal forms at State Office, it
> was brought to my attention that you received a warning; however, it
> was not indicated on your form.  I contacted Mr. James and told him that
> policy requires that I mark the "Non-compliance" box.  Therefore, this
> is why your form was changed.  It was changed to fix a [mistake].[102]

An Alabama DHR manual contained an inconsistent direction, however, stating that:

---

[98] *See* doc. no. 41 (Defendants' Evidentiary Submission), Ex. 9.

[99] *See id.*

[100] *See id.*; *see also id.*, Ex. 10.

[101] *See id.*, Ex. 10.

[102] *Id.*

"An appraisal form should not be modified after it has been signed by the employee except to correct a mathematical or heading error."[103]   James was informed of this provision at his deposition.   When asked whether he had violated the manual's instructions by amending plaintiff's Performance Appraisal, James acknowledged "I guess I did . . . . Yes, sir, I apparently did."[104]

## D.   "Harassment"

Plaintiff was subjected to many incidents which she characterizes as "harassment."   They are discussed below.

### 1.   "Personal" files

James and Ellis documented plaintiff's work performance in "personal" (not "personnel") files.   An employee's official *personnel* file included documents "regarding serious reprimands or punishments, suspensions, terminations and . . . [employee] evaluations."[105]   In addition, however, James and Ellis maintained *personal* files to retain documents which were less significant, but still permitted them to track an employee's work performance. James, for example, created a *personal* file for an employee if he fielded "a series of complaints or a number of complaints from different people regarding [that employee]."[106]   He created *personal* files to monitor

---

[103] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 21 at 62.

[104] Doc. no. 43, James deposition, at 151.

[105] *Id.*, at 115.

[106] *Id.* at 117.

four employees:  Sue Smith, who is white; Meg Wood, who is white; Elaine Willis, whose race is unknown; and plaintiff.[107]  James acknowledged that plaintiff's file was the most "lengthy."[108]

Henrietta Ellis also created *personal* files to monitor three employees:  Helton (white), Murphree (white), and plaintiff.  She acknowledged that plaintiff's file was "larger" than Murphree's and "much larger" than Helton's.[109]  Indeed, Ellis kept a large quantity of records in plaintiff's personal file.  The following evidence is before the court on summary judgment.  Ellis wrote a note to plaintiff on July 15, 1999, which read:  "Esther [plaintiff,] please have to me by 7-23-99 the following cases for review.  Thanks, Henri."[110]  Ellis issued a memorandum to plaintiff on April 29, 2002, which read, with individual names redacted from the record,

> I'm returning these [ ] records to you to complete some dictation that is missing.  There is no dictation from 3-7-01 to 7-17-01.  This includes a move from the [ ] home to the [ ] home.  I don't know if you have this dictation on your PC and failed to print it out or if you failed to do the dictation.
>
> For whatever reason, it is not in the record.  Please complete this and return the record to me.  Also I need you to do a written reason as to why [ ] does not have Medicaid.  And according to your dictation has not

---

[107] *See id.* at 135-136.

[108] *See id.* at 136 ("Elaine Willis has a fairly lengthy file.  I don't think it's quite on the level of Ms. Large's.").

[109] Doc. no. 44, Ellis deposition, at 52, 59.

[110] *Id.* at 176.

had it for quite some time.[111]

Ellis gave a copy of this memorandum to James for his records.[112]  Ellis transmitted an e-mail to plaintiff on July 29, 2003 which stated, with individual names redacted from the record, that:

> I have not yet [received] cards on this case and [ ] has not received the record or his card for the case.  I checked with [ ] and she had not received anything from you so she can set up the record and make cards. You took this assessment on 7-25 and entered it on assist. [ ] has already completed his assessment, and I have approved it.  I need the record to put the hard copy in.  Please get this completed ASAP.  Thanks, Henri.[113]

Ellis sent a copy of this e-mail to James.[114]  Ellis transmitted another e-mail to plaintiff on August 11, 2003 which read:  "Just a reminder to keep a check of the on-call schedules so you will always know when you are on call and we won't have the confusion we had during the night on Saturday night."[115]  Again, Ellis sent a copy of this e-mail transmission to James.[116]  Ellis also wrote a note to plaintiff on an unspecified date which read:  "Esther where's the bill?  Why am I getting this now? They have a Medicaid effective 1-03.  This needs to be filed for Medicaid, let me

---

[111] *Id.* at 182-83.

[112] *Id.* at 183.

[113] *Id.* at 173-74.

[114] *Id.* at 174.

[115] *Id.* at 178.

[116] *Id.* at 178-79.

know.  Henri."[117]  There also was a "Child Welfare Information System Exception Report" on which Ellis wrote, on an unspecified date: "Esther, please do whatever has to be done to clear these up."[118]  James wrote on that report:  "Why does this keep showing up?  This has been showing up for . . . months."[119]

### 2.    Impersonal communication

Ellis communicated with plaintiff primarily through e-mail transmissions and written memoranda.  That practice prompted plaintiff to complain that Ellis "does not come to my office and just sit down and talk with me, when I've known other workers, she'll go to their office and discuss things with them."[120]  Plaintiff does not specify when Ellis began the practice of communicating only in writing, although the record suggests that it was sometime during or after 1999.[121]

### 3.    "Tak[ing] the other worker's word rather than mine"

Plaintiff also believed that her supervisors favored co-workers in any dispute: "they always take the other worker's word rather than mine.  They never come to me and ask.  It's always put 'you did this.'"[122]  Plaintiff points to one incident involving

---

[117] *Id.* at 171.

[118] *Id.* at 166-68.

[119] *Id.* at 169.

[120] Doc. no. 42, Large deposition, at 114.

[121] *See id.* at 107, 110 (plaintiff's testimony came in response to the following questions: "Tell me the first incident starting in 1999 that demonstrates this hostile work environment"; and "starting in 1999, you can't give me a specific example"?).

[122] *Id.* at 113.

a co-worker named Alisha Tolbert, whose race is not specified in the record.  Tolbert told Ellis that plaintiff had refused to complete a report for a client.  According to plaintiff, Ellis simply assumed this was true without consulting plaintiff for her explanation.[123]  The record indicates that this incident occurred sometime during or after 1999.[124]

### 4.    Other criticism

Plaintiff's supervisors "constantly criticiz[ed]" her work performance, told her that she was not "getting [her work] done," that she was "not helping" her co-workers, and that she was not working well "with the people in the community."[125]  Plaintiff identified one occasion when she was assigned to assist five siblings who had been placed in foster care.  The mother was a "drug user" and "never did anything to get her child[ren] back."[126]  Nevertheless, the tables were turned when the mother failed to regain custody of her children and complained that it was plaintiff's fault.  Plaintiff stated that her supervisors "used this against me saying that I don't work [well] with people in the community."[127]  The record indicates that this incident occurred

---

[123] *See id.* at 111-113.

[124] *See supra* note 121.

[125] Doc. no. 42, Large deposition, at 109-110.

[126] *Id.* at 121.

[127] *Id.*

31

sometime during or after 1999.[128]  On another occasion, James advised plaintiff that

one of her clients had complained about her work.[129]  Plaintiff claims that "I found out

in court . . . . That really should not be done."[130]  The record indicates that this incident

also occurred sometime during or after 1999.[131]

### 5.    Performance Appraisals

As noted above, plaintiff received a Performance Appraisal on April 23, 2002,

in which she received a rating of "Exceeds Standards" rather than "Consistently

Exceeds Standards."  When she asked Rex Murphree to explain her score, he merely

replied, "there's room for improvement."  John James also amended plaintiff's April

21, 2003 Performance Appraisal to reflect the fact that she had received a written

warning during the review cycle.  Plaintiff asserted during her deposition that these

incidents constituted harassment.[132]

## III. DISCUSSION

### A.    Failure to Promote Claims

For the reasons discussed in Part I of this opinion, plaintiff's claims that John

James and Henrietta Ellis failed to promote her in 2001 to either "Service Supervisor"

---

[128] *See supra* note 121.

[129] Doc. no. 42, Large Deposition, at 120.

[130] *Id.*

[131] *See supra* note 121.

[132] *See* doc. no. 41, Large deposition, at 127-28, 134.

or "Quality Assurance Coordinator" because of her race, color, or sex are based upon the Equal Protection Clause of the Fourteenth Amendment, and asserted under 42 U.S.C. § 1983,[133] not Title VII. "Although discrimination claims against municipal [or state] employers are often brought under both Title VII and the equal protection clause (via section 1983), the two causes of action nonetheless remain distinct." *Thigpen v. Bibb County*, 223 F.3d 1231, 1239 (11th Cir. 2000).[134]

Section 1983 provides a means of seeking redress against governmental entities and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal

---

[133] Section 1983 is neither jurisdictional, nor "itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations and internal quotation marks omitted).

[134] The interplay and potential conflict between the remedies that might be pursued against state, county, and municipal employers under § 1983, and those rights and administrative prerequisites prescribed by Title VII of the Civil Rights Act of 1964, did not become an issue until 1972, when Congress amended the Civil Rights Act of 1964 to make Title VII applicable to state and municipal employers, against which § 1983 previously had been the principal avenue for seeking redress for complaints of discrimination. Only then did courts confront the possibility that Title VII had supplanted § 1983 claims as the appropriate remedy against these employers. After reviewing the legislative history of the amendments, however, the Eleventh Circuit concluded that "Congress intended to make available separate, non-exclusive causes of actions and remedies under these provisions, and held that a plaintiff may bring a claim under one provision without asserting a claim under the other." *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1103 (11th Cir. 2001) (citing *Thigpen v. Bibb County*, 223 F.3d 1231, 1237-39 (11th Cir. 2000)).

The Eleventh Circuit acknowledged in *Johnson v. City of Fort Lauderdale*, 148 F.3d 1228 (11th Cir. 1998), that a plaintiff may "be able to undermine Title VII's procedural safeguards by suing directly under § 1983 for unconstitutional employment discrimination." *Id.* at 1231. The Court explained, however, that "such a result is merely 'a byproduct' of Congress's choice to make multiple remedies available." *Id.* (citations omitted).

statutes.[135]   The statute was enacted for the express purpose of enforcing the

Fourteenth Amendment.  *See, e.g., Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972).

The two essential elements of a § 1983 claim are:  (1) the conduct complained of was

committed by a person acting under color of state law; and (2) this conduct deprived

plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the

United States.  *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *partially overruled*

*on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Burch v.*

*Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988)

(*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990).

Defendants do not dispute that their actions were "under color of state law."

With regard to the second element, "[s]ection 1983 actions challenging racial [or

gender] discrimination under the equal protection clause . . . require a showing of

discriminatory motive."  *Lee v. Conecuh County Board of Education*, 634 F.2d 959,

962 (5th Cir. 1981).[136]

Where, as here, a plaintiff employs circumstantial evidence to prove

discriminatory motive, she must rely on the analytical framework that the Supreme

Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and

---

[135] *See supra* note 133.

[136] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down
prior to the close of business on September 30, 1981.

then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Even though that now familiar framework was developed in the context of cases based upon Title VII of the Civil Rights Act of 1964, it also is applied to § 1983 race and gender discrimination claims.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming that "the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983"); *Thigpen*, 223 F.3d at 1239 (observing that the Eleventh Circuit "'evaluate[s] . . . [section] 1983 race discrimination claims *supported by circumstantial evidence* using the framework set out . . . in *McDonnell Douglas*'") (emphasis in original) (quoting *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1082-83 (11th Cir. 1996)); *Lee v. Conecuh County*, 634 F.2d at 961-62 (applying *McDonnell Douglas* framework to examine merits of failure-to-promote claims brought under both § 1983 and Title VII); *Alexander v. Chattahoochee Valley Community College*, 325 F. Supp. 2d 1274, 1276, 1280 (M.D. Ala. 2004) (same); *Merriweather v. Alabama Department of Public Safety*, 17 F. Supp. 2d 1260, 1265, 1267-68 (M.D. Ala. 1998) (same).

Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6.  "The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden

of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).

To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a *prima facie* case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id*. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's *prima*

*facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### 1.   Service Supervisor

Plaintiff offers no direct evidence that John James rejected her application for the Service Supervisor position because of her race or sex; therefore, she bears the initial burden of establishing that: (1) she is a member of a group protected by the Equal Protection Clause of the Fourteenth Amendment; (2) she applied for, and was qualified to fill, a position for which defendant was accepting applications; (3) despite her qualifications, she was rejected for the position; and (4) after her rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class. *Cf., e.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualification of the person promoted instead of plaintiff as part of her *prima facie* case for failure to promote); *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980). All of these elements have been satisfied: plaintiff, as an

African-American female, is protected by the Fourteenth Amendment's Equal Protection Clause; she applied for and was qualified to fill the position of Service Supervisor because she met the stated, minimum qualifications (*i.e.*, she had more than two years of experience as a social worker, and she completed the requisite testing administered by the State Personnel Department); and John James awarded the position to Rex Murphree, a white male.  The burden therefore shifted to defendants to articulate a legitimate, non-discriminatory reason for the contested employment action.

James testified that he offered the position to Murphree because he was "the best qualified person for the job."[137]

> At that time, Mr. Murphree had worked for DHR for 18 years (started in August 1983).  He had a good work record and had knowledge of the requirements of the *R.C.* consent decree.  Most importantly, he was in band 3 on the register.  Ms. Large had worked for DHR for 19 years (started in January 1982) and also had a good work record.  However, she was in band 5 of the register, the lowest of any of the candidates.  A placement in band 5 indicates a low score on the supervisory test.[138]

Certainly, James's opinion that Murphree was better qualified is a legitimate, non-discriminatory reason for failing to promote plaintiff, provided James's subjective decision was not tainted by racial or gender considerations.  *See, e.g., Cooper v. Southern Co.*, 390 F.3d 695, 744 (11th Cir. 2004) ("However, the district court also

---

[137] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 5.
[138] *Id.*

concluded that Wilson had not established pretext as to the legitimate reason proffered to explain denying Wilson the promotion — that Fuller, the hiring manager, sincerely believed that McFall was better qualified."). The burden thus shifted back to plaintiff to prove pretext.

When an employer offers as its reason for *not* promoting a plaintiff the assertion that the person who *was* promoted was "more qualified," a plaintiff's burden to demonstrate pretext is heavy:

> [A plaintiff] cannot . . . establish pretext simply by showing that she is more qualified than [the person who was selected]. *See Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000). Rather, [the plaintiff] must adduce evidence that the disparity in qualifications is "so apparent as virtually to jump off the page and slap you in the face." *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir.2001); *Lee*, 226 F.3d at 1254; *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1340 (11th. Cir.2000) (all quoting *Deines v. Texas Dep't of Protective & Regulatory Serv.*, 164 F.3d 277, 280 (5th Cir.1999)).

*Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001) (alterations in original). Hence, within the Eleventh Circuit, the standard for addressing relative qualifications requires a plaintiff to prove that she was "substantially more qualified than the person promoted" in order to establish pretext. *Lee*, 226 F.3d at 1255. As the district court observed in *Norrell v. Waste Away Group, Inc.*, 246 F. Supp. 2d 1213 (M.D. Ala. 2003),

> [t]his high standard for establishing discrimination based on the relative qualifications of the competitors for a promotion serves the

> purpose of keeping the federal courts from second-guessing decisions
> made by employers in the course of their business.  As the Eleventh
> Circuit explained in *Damon v. Fleming Supermarkets of Florida, Inc.*,
> 196 F.3d 1354, 1361 (11th Cir. 1999), federal courts "are not in the
> business of adjudging whether employment decisions are prudent or fair.
> Instead, our sole concern is whether unlawful discriminatory animus
> motivated a challenged employment decision."

*Norrell*, 246 F. Supp. 2d at 1223 n.12.

Plaintiff contends that the following evidence proves that James's stated reasons for the decision are pretextual:  (1) Henrietta Ellis, who harbored animus against African Americans, influenced John James's decision to reject plaintiff's application for promotion; (2) at the time of decision, plaintiff had been employed with Blount DHR for nineteen years, while Murphree had been employed with that agency a year less than she (eighteen years); (3) plaintiff had "more experience in child welfare services than did Murphree," because she had worked in child welfare during her entire career with Blount DHR, while Murphree had worked in child welfare for only twelve years (he was assigned to adult services from 1994 to 1999); and (4) the Service Supervisor position did not require working knowledge of the *R.C.* consent decree.[139]

This court does not agree; plaintiff's evidence falls short of proving pretext.[140]

---

[139] Doc. no. 55 (Plaintiff's Opposition), at 11.

[140] The court may dismiss, for the sake of discussion, James's claim that he promoted Murphree partly because of his knowledge of the *R.C.* consent decree.  Certainly, there is no evidence that this knowledge was necessary, or even desirable, for the Service Supervisor position.

First, there is no evidence that Ellis influenced James's decision to promote Murphree. Second, the fact that plaintiff had one more year of experience at Blount DHR than Murphree is not significant, given the lengthy career of each applicant. Moreover, the fact that plaintiff had nineteen years of experience in child welfare, versus twelve years for Murphree, is not compelling, because applicants for the Service Supervisor position only were required to "have at least two years' experience as a *social worker*." There is no indication that specialized knowledge of child welfare was necessary, or that Murphree's twelve years of experience would be deficient even if it were. Finally, plaintiff's score on the State Personnel Department's test placed her in "Band 5," while Murphree's score placed him in "Band 3," a far superior mark. Thus, based on a consideration of all factors, the court cannot conclude that plaintiff was "better qualified" for the promotion than Murphree, much less "substantially more qualified."

## 2.    Quality Assurance Coordinator

Plaintiff again satisfies each element of a *prima facie* case. She is a member of a protected group, and she applied for the position (albeit, only after initially declining the opportunity to be placed in the position prior to its reclassification by the State Personnel Department as a supervisory position). Further, based upon the facts that plaintiff was listed on the register of eligibles issued by the State Personnel

Department and was interviewed, the court may infer that she was qualified for the position.  Finally, the position was "filled" by a white female.

John James again contends that Cheryl Helton was "the best qualified person for the position."[141]

> [Helton] had worked for DHR, both in Blount County and in Lowndes County, for 12 years (starting in January 1989).  She had also held a financial support supervisory position in Lowndes County.  I took into consideration the fact that she had performed well in the QA position for the past month while it was still a worker [*i.e.*, non-management] position.  However, one of the most significant factor[s] was that she was listed in band 3 on the register while [plaintiff] was in band 5 on the register . . . .  This indicated that Ms. Helton performed significantly better on the supervisory test than did [plaintiff].  Even if Ms. Helton had not been serving in the QA position at the time it was elevated to a supervisor position, her higher score on the supervisory test would have made her better qualified than [plaintiff] for the QA supervisor position.[142]

Plaintiff contends that the following evidence establishes that James's stated reasons were a pretext for discrimination on the basis of her race:  (1) Henrietta Ellis influenced James's decision to reject plaintiff's application for the QA Supervisor position; (2) plaintiff was better qualified than Helton for the QA supervisor position; and (3) James promoted Helton to the QA Supervisor position "before he even interviewed or otherwise considered [plaintiff's] application."[143]   The court will

---

[141] Doc. no. 41 (Defendants' Evidentiary Submission), Ex. 1, James affidavit, at 4-5.

[142] *Id.*

[143] Doc. no. 55 (Plaintiff's Opposition), at 13.

address each argument in turn.

### a.  Ellis's influence on promotion decision

In *Gunter v. Coca-Cola Company*, 843 F.2d 482 (11th Cir. 1988), an African-American plaintiff applied for promotion to the position of "Feed Mill Superintendent."  *Id.* at 483.  While the plant manager exercised sole authority for the promotion decision, a middle manager recommended a white employee named W.B. Whatley.  The middle manager had supervised both the plaintiff and Whatley.  *Id.* & n. 1.  More significantly, he was blatantly racist.  *Id.* at 483 n.2.  The plant manager ultimately decided to promote Whatley.  The plaintiff alleged that his employer had discriminated against him on the basis of race in violation of Title VII and, at a bench trial, sought to prove his case through the use of circumstantial evidence.  The district court concluded that the plaintiff had failed to prove pretext because the plant manager's decision "was neither racially biased nor swayed by the racial sentiments" of the middle manager.  *Id.* at 484.  The Eleventh Circuit affirmed, reasoning as follows:

> We do not doubt that the district court was correct in concluding that [the middle manager] was racially biased.  The record, however, contains no evidence that [the plant manager who actually made the promotion decision] was racially biased.  Furthermore, as there is evidence to the effect that [the plant manager] based his promotion decision on his personal observations of [the plaintiff's work performance], and not necessarily upon [the middle manager's] recommendations, the district court committed no clear error in declining to find that [the defendant's

race-neutral explanation for the promotion decision] was a pretextual excuse for failing to promote [the plaintiff].

*Id.* at 484.  The dissent viewed the record differently, finding that the plant manager based his promotion decision "primarily on input from [the middle manager] who was found to be racially biased."  *Id.*  The Eleventh Circuit panel therefore split on the *factual* issue of whether the racist manager had influenced the challenged decision. Nevertheless, *Gunter* is instructive.

There is no evidence that John James, the ultimate decisionmaker in this instance, was racially biased; even so, a reasonable jury could conclude that Henrietta Ellis was.  When another Blount DHR African American employee complained in 1995 or 1996 that one of her clients had called her "nigger" and a "Nubian bitch," two despicable racial slurs, Ellis responded only with "neglect" and "nonchalance." Approximately four years later, in 1999, plaintiff's application for a non-management position was denied.  When one of plaintiff's white co-workers asked Ellis to explain this decision, Ellis responded, "the community is just not ready for Esther."  The co-worker and plaintiff both believe this statement evidenced racial animus.

A reasonable jury also could conclude that Henrietta Ellis influenced James's decision.  Ellis advised James that Helton was "doing a good job," but did not make a similar recommendation for plaintiff.  When James was asked whether Ellis's input

44

"figured into [his] decision," he replied: "But yes. Sure, sure, yes, sir."[144]

These facts constitute circumstantial evidence that Henrietta Ellis may have exercised a racially-discriminatory influence on the ultimate decisionmaker's choice. *Cf. Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (racist comments that are either too remote in time or too attenuated because they were not directed at the plaintiff may be circumstantial (but not direct) evidence of discrimination).

Nevertheless, these facts do *not* satisfy plaintiff's burden to establish that John James's stated reason for selecting Chery Helton is pretextual. In *Ross*, an African-American plaintiff claimed that he was fired by two supervisors because of his race, in violation of Title VII. The supervisors, Ron Kirkland and Kevin Sweeney, offered a race-neutral explanation for the termination: plaintiff was fired because he solicited tips at work. *Id.* at 1288, 1291. The plaintiff offered three pieces of evidence to show that this reason was in fact pretext for race discrimination. First, he testified that approximately four years before his termination Sweeney said, "I never seen as many blacks in this building except in a Tarzan movie." *Id.* at 1291. The plaintiff also testified that, "sometime prior to his being fired," Kirkland pointed to him and said:

---

[144] Doc. no. 43, James deposition, at 98-99. Cheryl Helton opined that, if Henrietta Ellis recommended an employee for promotion, her input would be "very, very important" to John James's decision-making process. Doc. no. 46, Helton deposition, at 82.

"You see that one over there, I am going to get rid of him." *Id.* (The plaintiff argued that the reference to "that one over there" evidenced racial animus.) Finally, the plaintiff testified that Kirkland had himself solicited tips at work, although the plaintiff was supposedly fired for the same behavior. The Court went on to say:

> Because [the plaintiff's] case turned on circumstantial evidence, the proper inquiry is whether Sweeney's "Tarzan" remark and Kirkland's remark, when read in conjunction with the entire record, are circumstantial evidence of those decisionmakers' discriminatory attitude. If so, the court must then determine whether such circumstantial evidence, along with other evidence (including [the plaintiff's] prima facie case), might lead a reasonable jury to disbelieve [the employer's] proffered reason for firing [the plaintiff]. We conclude that these comments, considered together with the fact that Kirkland had received tips, support the jury's rejecting [the employer's] proffered explanation for firing [plaintiff].

*Id.* at 1292 (alterations supplied).

Later Eleventh Circuit decisions distinguished *Ross* and, in the process, clarified its meaning. In *Rojas v. Florida*, 285 F.3d 1339 (11th Cir. 2002), the Eleventh Circuit held that an isolated discriminatory comment, unrelated to the challenged employment decision, was not alone sufficient to establish a genuine issue of material fact on the subject of pretext. *Id.* at 1343. *Rojas* characterized *Ross* as a case in which "fairly strong additional evidence supported a finding of pretext (*specifically, that the supervisor who had fired plaintiff had been engaged in the same activity for which plaintiff was fired*)." *Id.* at 1343 (emphasis supplied). The Eleventh Circuit reiterated

this point in *Scott v. Suncoast Beverage Sales*, 295 F.3d 1223 (11th Cir. 2002), saying that, "[a]lthough a comment unrelated to [an employment] decision may *contribute* to a circumstantial case for pretext, *see Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998), it will usually not be sufficient absent some additional evidence supporting a finding of pretext." *Scott*, 295 F.3d at 1229 (citing *Rojas*, 285 F.3d at 1343) (emphasis in original).

Here, Ellis's nonchalance toward Marva Reed's complaint of racial harassment in 1995 or 1996 was remote in time to the challenged promotion decision, which occurred in 2001, and unrelated to it. Ellis's comment that "the community is just not ready for Esther," made in reference to plaintiff's application for a Quality Assurance position in 1999, also was remote in time and unrelated to the decision. Hence, plaintiff may not prove pretext absent "some additional evidence," or perhaps even "fairly strong additional evidence," of discrimination. The court therefore turns to plaintiff's remaining arguments with this principle in mind.

### b. Plaintiff's qualifications

Plaintiff claims that she was more qualified than Cheryl Helton for the Quality Assurance Coordinator position. A recent Eleventh Circuit decision added a gloss to the "relative qualifications" standard for proving pretext discussed in Part III(A)(1) *supra*, saying that:

> Admittedly, our precedent makes clear that where an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff. *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000). However, where the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext. *See Bass* [*v. Board of County Commissioners*, 256 F.3d 1095[, 1107 (11th Cir. 2001)] ("Hiring a less qualified person can support an inference of discriminatory motivation.").

*Vessels v. Atlanta Independent School System*, 408 F.3d 763, 772 (11th Cir. 2005) (emphasis in original).

At the time of the promotion decision, plaintiff had been a social worker for nineteen years *versus* twelve years for Helton. Plaintiff also had worked in child welfare for nineteen years *versus* four for Helton. While this evidence alone suggests that plaintiff was better qualified, there were countervailing factors. Plaintiff's score on her supervisory exam placed her in "Band 5," while Helton's score placed her in "Band 3," a far superior mark. In addition, Helton previously held a supervisory position at Lowndes County DHR before taking a "voluntary demotion" to a non-management position at Blount DHR. She therefore had management experience, while plaintiff did not. When all facts are considered, this court cannot conclude that plaintiff was better qualified for the position of QA Supervisor, or that she has satisfied her burden to prove pretext on these grounds.

c.      **Interview**

Finally, plaintiff contends that "James appointed Helton to the elevated Q/A Supervisor position before he even interviewed or otherwise considered [plaintiff's] application."[145]  This statement conflates two arguments, which will be addressed separately.

First, plaintiff claims that James promoted Helton "before he . . . considered [plaintiff's] application."  To evaluate this argument, the court must determine when and how a Blount DHR employee commenced an application for promotion.  Helton testified during her deposition as follows:

> Q.      I mean, tell me how that works as far as when you want to get considered for a supervisory position?
>
> A.      I submitted my application.  Contacted the state personnel [department] and submitted my application.  And then I was notified that the [supervisory] test was to be given, the date.  I went to that location and took the test.  Then I received my scores.
>
> Q.      And then, based on that, is that how you get considered for supervisory positions that may come up later?
>
> A.      Yes.
>
> Q.      And I think that your testimony was that you were in Band three; is that correct?
>
> A.      That's correct.[146]

---

[145] Doc. no. 55 (Plaintiff's Opposition), at 13.

[146] Doc. no. 46, Helton deposition, at 119-120.

Based on this testimony, the court finds that both plaintiff and Helton essentially had "applied" for the QA Supervisor position when James received the register of eligible candidates from the State Personnel Department.  Of course, this does not mean that James made his decision even "before he . . . considered [plaintiff's] application." There is no evidence that James decided to promote Helton *before* he received the register of eligible candidates.  Indeed, the fact that James initially offered the position to plaintiff before the State Personnel Department approved his request for reclassification points in the opposite direction.

Plaintiff also contends that "James appointed Helton to the elevated Q/A Supervisor position before he even interviewed" plaintiff for the position.  Certainly, the interviews may have been perfunctory.  James told plaintiff that the QA Supervisor position "had already been taken by Cheryl Helton, but he was interviewing [plaintiff] for the position," because she had "a right to be interviewed." This does not bolster plaintiff's circumstantial proof of pretext.  Significantly, interview performance had no bearing on the decision to reject plaintiff's application. James promoted Helton because:  (1) "she had worked for DHR, both in Blount County and in Lowndes County, for 12 years"; (2) she "held a financial support supervisory position in Lowndes County"; (3) "she had performed well in the QA position for the past month while it was still a worker [*i.e.*, non-supervisory] position";

and (4) "she was listed in band 3 on the register while [plaintiff] was in band 5 on the register."  Of course, James knew these facts *before* he interviewed plaintiff and Helton for the QA Supervisor position.  That James proceeded to interview both candidates (even if for the mere sake of formality) does not evidence discriminatory intent.

In sum, there are only two consideration which arguably contribute to plaintiff's proof of pretext:  (1) her *prima facie* case; and (2) the inference that James's promotion decision was influenced by Ellis, whose nonchalant attitude and comments, although remote in time, and unrelated to the challenged employment decision, evidence a racial bias.  This evidence together is not sufficient to demonstrate pretext. *See Rojas*, 285 F.3d at 1343; *Scott*, 295 F.3d at 1229.

## B.   Hostile Work Environment

Employees of state governments have a constitutional right, arising from the Equal Protection Clause of the Fourteenth Amendment, to be free from unlawful racial and sexual discrimination and harassment in public employment.  *Cf. Cross v. State of Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995) (addressing sexual harassment claims arising under the Equal Protection Clause and pursued through § 1983).[147]

---

[147] The largest number of hostile work environment cases during recent years have involved claims of sexual harassment.  Even so, the theory of a "hostile work environment" is not so limited; and, to the extent that it is possible to do so, all cases of alleged harassment should be analyzed in the same manner, and judged by the same standards, regardless of whether the harassment is

Whenever state employees allege a violation of rights under the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, the elements of a *prima facie* case are similar to, but different in some respects from, racial harassment claims under Title VII or 42 U.S.C. § 1981.[148]  That is, a plaintiff must show:  (1) she is a member of a class of persons protected by the Equal Protection Clause of the Fourteenth Amendment; (2) she was subjected to unwelcome harassment in her workplace (3) by persons who acted under color of state law; (4) the

---

motivated by an employee's race, color, religion, sex, national origin, age, or disability.  *See generally* Barbara T. Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 4 (Supp. 1999).

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court expressed a preference for harmonious, if not identical, standards of analysis:  "Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."  *Id.* at 787 n.1.

[148] The elements of a Title VII or § 1981 hostile work environment racial harassment claim are the same.  *See Vance v. Southern Bell Telephone and Telegraph Company,* 863 F.2d 1503, 1509 n.3 (11th Cir. 1989) ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.")); *see also*, *e.g.*, *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

A *prima facie* racially hostile work environment case under Title VII or § 1981 has five elements:  (1) the employee belongs to a class of persons protected by Title VII or § 1981; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability.  *See, e.g., Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).  *Cf. Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002) (harassment based on the plaintiff's national origin); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment).

harassment was based upon her race or sex; (5) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment, and created an abusive working environment; and (6) the defendant acted with a discriminatory purpose or intent. *See Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997) (discussing elements of hostile work environment sexual and racial harassment claims under the Equal Protection Clause) (citing *Cross*, 49 F.3d at 1504, 1507-08).

Cutting to the chase — the element that "tests the mettle of most . . . harassment claims," *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) — this court concludes that a reasonable person could not characterize the harassment complained of to be "severe or pervasive." This element contains both an objective and subjective component. To be actionable, a plaintiff must show not just that she subjectively believed the environment to be hostile or abusive, but that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Sytems, Inc.*, 510 U.S. 17, 21-22 (1993); *Gupta*, 212 F.3d at 583; *Watkins*, 105 F.3d at 1355-56. As the Eleventh Circuit observed in *Gupta*, "a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee." 212 F.3d at 586.

When evaluating the objective severity or pervasiveness of the harassment, district courts must examine all of the circumstances, which may include such factors as: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance. *Harris*, U.S. 17 at 23; *see also, e.g., Mendoza v. Borden*, 195 F.3d 1238, 1248-49 (11th Cir. 1999) (*en banc*); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002); *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995).

Construing the evidence in the light most favorable to plaintiff, she presented evidence of six categories of harassing conduct:  (1) Henrietta Ellis "constantly" criticized plaintiff's work performance in memoranda and e-mail transmissions (copies of which were retained in Ellis's "personal" file); (2) Ellis regularly communicated with plaintiff through written means of communication rather than in person; (3) when Alisha Tolbert, a co-worker, accused plaintiff of refusing to complete a report for a client, Ellis simply assumed this was true without consulting plaintiff for her explanation; (4) John James informed plaintiff in court (rather than in a more private setting) that one of her clients had complained about her work; (5) plaintiff received marks of "Exceeds Standards" (rather than "Consistently Exceeds

54

Standards") on two Performance Appraisals, and when she asked Rex Murphree to explain her score on one evaluation, he merely replied "There's room for improvement"; and (6) John James amended one of plaintiff's Performance Appraisals to reflect the fact that she had received a written warning during the review cycle. Presumably, plaintiff also may wish to include her June 5, 2002 written warning as evidence supporting her hostile work environment claim.[149]

Two of the four factors are clearly absent here.  The conduct established by plaintiff was not "physically threatening or humiliating," nor is there any evidence that the conduct complained of interfered with plaintiff's job performance.  The alleged conduct also was not "severe."  It often has been said of hostile work environment claims asserted under Title VII of the Civil Rights Act of 1964 — which was enacted pursuant to Congress's powers under section 5 of the Fourteenth Amendment[150] — that the statute is neither "a shield against harsh treatment in the workplace," *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984), nor a "general civility code for the American workplace."  *Oncale v.*

---

[149] Plaintiff did not specifically assert that the warning was an incident of racial or sexual harassment.

[150] The Supreme Court held in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-56 (1976), that the 1972 amendments to Title VII — which altered the definition of "person" in 42 U.S.C. § 2000e(a) to provide that "governments, governmental agencies, [and] political subdivisions" are included within that term — were Congressional action intended to pierce the Eleventh Amendment veil of immunity.  *See also*, *e.g.*, *Cross v. State of Alabama*, 49 F.3d 1490, 1502 (11th Cir. 1995) ("It is undisputed that the Eleventh Amendment does not bar appellees' Title VII suit.") (citing *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987)).

*Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (same).   Those principles are no less applicable to a claim based directly upon the Equal Protection Clause of that Amendment.   Here, a reasonable person could not characterize any of the incidents cited by plaintiff as "severe," nor could   a reasonable person characterize the cumulative evidence as being so.   *See Lombardo v. Potter*, 368 F. Supp. 2d 1178 (D. Kan. 2005);[151] *Jones v. Norton*, 2004 WL 3321483 (E.D. Va. July 22, 2004).[152]   *See*

---

[151] In *Lombardo*, a *pro se* plaintiff claimed that his employer retaliated against him for filing complaints with the EEOC, and that the alleged retaliation created a hostile work environment.   368 F. Supp. 2d at 1181.   The district court declined to address the threshold issue of whether a "retaliatory hostile work environment" claim was cognizable under Title VII.   Instead, the court bore down to the decisive issue of whether the conduct complained of was sufficiently "severe or pervasive" as to affect the terms, conditions, or privileges of employment.   *See id.* at 1195-96.   The district court did not analyze each of the four factors:   frequency; severity; physical intimidation or humiliation; and, interference with work performance.   Nonetheless, the court concluded that the following incidents, which occurred over a ten year span, were not cumulatively "severe or pervasive":   (1) plaintiff's supervisor criticized his work performance and required him to provide medical documentation for absences; (2) plaintiff was relieved of his duties as supervisor of a particular work unit, although he remained a supervisory level employee at the same pay rate; (3) plaintiff was denied the opportunity to act as the "Acting Manager, Distribution Operations" ("MDO") on two different dates, although he was allowed to act as the MDO on other dates; (4) Stella Newsom (whose position is not specified in the district court's opinion) transmitted an e-mail to company managers to explain the basis of an EEO claim filed by plaintiff, why it was rejected, and that it was beneficial to keep records; (5) plaintiff's direct supervisor issued a letter of warning to plaintiff after he failed to attend a mandatory training session; (6) after plaintiff transmitted an e-mail to one of his supervisors, the supervisor transmitted a reply e-mail, wherein he said that he did not like the tone of plaintiff's e-mail, and that insubordination would not be tolerated; (7) plaintiff's request for a temporary work assignment in Florida was denied; (8) plaintiff received a letter of warning for poor work performance; and (9) after plaintiff returned from medical leave, his request for a light duty position was denied.   *See id.* at 1183-89, 1193, 1194, 1196.

[152] In *Jones*, plaintiff claimed that she was subjected to a hostile work environment because of her race, African American.   The district court did not analyze each of the four factors: frequency; severity; physical intimidation or humiliation; and, interference with work performance. Even so, the court concluded that the following alleged conduct, which occurred over a period of

*also Lyon v. Jones*, 260 F. Supp. 2d 507 (D. Conn. 2003).[153]

Finally, aside from plaintiff's assertion that she was "constantly" criticized by her supervisors, the conduct alleged by plaintiff was not frequent.  The Eleventh Circuit held in *Mendoza* that five instances of alleged sexual harassment, occurring over an eleven month period, were "far too infrequent to alter the conditions under which [plaintiff] was required to perform her job."  195 F.3d at 1249.  Here, plaintiff

---

approximately three years, was not cumulatively "severe or pervasive":

> Ms. Thomas (who is white) placed the Plaintiff under close scrutiny, by checking Plaintiff's work on an hourly basis; she spoke to her "in a negative tone and in a negative demeanor;" and she treated her in a "condescending manner [as if she were] stupid."

> ... Ms. Williams [plaintiff's immediate supervisor] also harassed Plaintiff by scrutinizing her work more closely than she needed to do.  Every morning, as soon as Ms. Williams arrived at work, she would drop off her coat, get her cup of coffee, and go "straight to [Plaintiff's] desk."  Then she would always ask Plaintiff about the work she planned to do during the day and how much work she had accomplished before Ms. Williams arrived.

> . . . .

> Whenever Ms. Williams asked her daily questions, Plaintiff would show her the time management log for her work that her Lead Technician signed off on and which had the answers to [Ms. Williams'] questions.  Nonetheless, Ms. Williams "would look at the log and ask [her] the same questions again."  Ms. Williams would also yell at Plaintiff and scream at her when she was instructing her to do something, and she would even "hit [Plaintiff's] keyboard to see what [she] was working on."

2004 WL 3321483, at * 4-5 (some bracketed alterations added) (internal citations omitted).

[153] Alleged harassment was not "severe or pervasive" where during the course of "several years":  (1) plaintiff received an annual performance evaluation which rated her overall work performance as "less than good"; (2) plaintiff received a written reprimand for allegedly "invading the personal space of her co-worker"; (3) plaintiff was asked to remove a sign from outside her cubicle; and (4)  plaintiff's supervisor "treated her 'like an idiot'" on one occasion when requiring her to complete her work.  *Lyon*, 260 F. Supp. 2d at 510, 512.

is able to identify no more than twelve incidents of alleged harassment over a span of approximately four years.[154]  Assuming that plaintiff's testimony about "constant" criticism established the frequency factor, that alone is insufficient to defeat summary judgment.  *See Mendoza*, 195 F.3d at 1249 ("To the  extent Mendoza's testimony about 'constant' following and staring established the frequency factors, this evidence does not create a jury issue on Mendoza's sexual harassment claim.").

## C.    Retaliation

As recorded at the beginning of this opinion, plaintiff filed an EEOC charge against Alabama DHR and Blount DHR on October 23, 2001.  The EEOC terminated its investigation of the charge, and mailed plaintiff a right-to-sue letter, on March 8, 2002.  Plaintiff waited fourteen months to commence this action.  As a consequence, any Title VII claims that could have been asserted in a judicial complaint based upon the allegations in plaintiff's EEOC charge were time-barred.  Furthermore, as noted in Part I of this opinion, "[a] pure or generic retaliation claim . . . simply does not

---

[154] Henrietta Ellis sent written correspondence to plaintiff on the following dates: (1) July 15, 1999; (2) April 29, 2002; (3) July 29, 2003; and (4) August 11, 2003.  Plaintiff received her Performance Appraisals on the following dates: (5) April 23, 2002; and (6) April 21, 2003.  When plaintiff asked Rex Murphree to explain the score she received on her April 23, 2002 Performance Appraisal, Murphree merely replied:  (7) "there's room for improvement."  Furthermore:  (8) John James amended plaintiff's April 21, 2003 Performance Appraisal to reflect the fact that she had received a written warning during the review cycle.  Also, sometime after 1999:  (9) Ellis did not confer with plaintiff after Alisha Tolbert accused plaintiff of refusing to complete a report for a client; and (10) John James advised plaintiff in court that one of her clients had complained about her work.  Plaintiff also received two written communications from Ellis and James on unspecified dates.

implicate the Equal Protection Clause." *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997). It follows, therefore, that this court erred when failing to grant defendant's motion to dismiss the Title VII retaliation claim asserted in plaintiff's amended complaint.

District courts "generally have no jurisdiction to hear claims of discrimination based on retaliation *unless a charge is first filed with the EEOC*." *Barrow v. New Orleans Steamship Association*, 932 F.2d 473, 479 (5th Cir. 1991) (emphasis supplied). There is a limited exception to that rule, however. District courts are allowed to exercise "ancillary jurisdiction" over a retaliation claim, "even though not filed with the EEOC, 'when it grows out of an administrative charge that is *properly* before the court.'" *Id*. (emphasis in original) (quoting *Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981)).[155] Stated somewhat differently, a retaliation claim does not require "administrative exhaustion" (*i.e.*, the filing of a separate EEOC charge) when the adverse employment actions that a plaintiff claims were inflicted in retaliation for filing her initial EEOC charge, *and the*

---

[155] While decisions of the "Unit A" panel of the former Fifth Circuit entered *after October 1, 1981* are not binding precedent in the Eleventh Circuit, such decisions are, nevertheless, "persuasive." *United States v. Chapman*, 866 F.2d 1326, 1332 (11th Cir. 1989) (citing *Matthews v. United States*, 713 F.2d 677, 683 n.1 (11th Cir. 1983), and *Stein v. Reynolds Securities, Inc*. 667, F.2d 33, 34 (11th Cir. 1982)). As noted in citation, however, the *Gupta* decision was entered *prior to* October 1, 1981; consequently, it is binding precedent. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981 as binding precedent within the Eleventh Circuit).

complaints contained in the initial EEOC charge are "properly before the court." *Gupta*, 654 F.2d at 414.  *See Hargett v. Valley Federal Savings Bank*, 60 F.3d 754, 762 (11th Cir. 1995) ("In *Gupta*, the court held that there is no need to file a subsequent EEOC charge involving a retaliation claim where the claim 'grows out of an administrative charge that is properly before the court,' because the court has ancillary jurisdiction over the claims.").

Here, however, none of the claims contained in plaintiff's October 23, 2001 EEOC charge are "properly before the court."  Plaintiff failed to file a judicial complaint within 90 days of receiving her notice of right to sue.  As a result, this court cannot exercise "ancillary jurisdiction" over the retaliation claim.  *See Hargett*, 60 F.3d at 762 (holding that a retaliation claim cannot relate back to an age discrimination claim that was not timely filed); *Barrow*, 932 F.2d at 478 (holding a retaliation claim growing out of an untimely age discrimination charge was not "'properly' before the district court").  *See also, e.g., McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 482-83 (7th Cir. 1996).

## IV. CONCLUSION

All claims in plaintiff's amended complaint against any defendant are due to be dismissed with prejudice, and an appropriate order to that effect will be entered.

DONE this 12th day of August, 2005.

_____
United States District Judge